**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

| | |
|---|---|
| ELEVANCE HEALTH, INC., | Case No. 1:23-cv-1497 |
| Plaintiff, | |
| v. | |
| VINOD MOHAN, | |
| Defendant. | |

**COMPLAINT**

Plaintiff Elevance Health, Inc., formerly known as Anthem, Inc. ("**Elevance Health**"), by counsel, for its Complaint against Defendant Vinod Mohan ("**Mohan**"), alleges as follows.

**NATURE OF ACTION**

1.      This is an action for damages and injunctive relief brought by Elevance Health, an Indiana-based business, against Mohan, a former highly compensated senior executive at Elevance Health, for misappropriation and threatened misappropriation of Elevance Health's trade secrets and confidential information in violation of the Indiana Uniform Trade Secrets Act and the Defend Trade Secrets Act, for breach of the Confidentiality Provisions in Mohan's Equity Agreements with Elevance Health, for breach of her fiduciary duty of loyalty to Elevance Health, for conversion, and for computer trespass.

2.      Until July 17, 2023, Mohan led Elevance Health's Medicare business in Arizona, California, Colorado, New Mexico, Nevada, Texas, Washington, and Florida. Despite her obligations to Elevance Health, Mohan took and retained Elevance Health's trade secrets and highly confidential and proprietary information in order to provide her new employer, Elevance Health's direct competitor, Molina Health, Inc. ("**Molina**"), with an unfair competitive advantage over Elevance Health in the Medicare market. Elevance Health, therefore, files this Complaint to

obtain injunctive relief and to recover damages for the harm already caused to its business by Mohan's actions. Elevance Health requests a hearing at the Court's earliest opportunity and an order for injunctive relief, pursuant to Rule 65 of the Federal Rules of Civil Procedure, enjoining Mohan from further misappropriation of Elevance Health's trade secrets and confidential information.

## PARTIES

3.      Plaintiff Elevance Health, Inc. is an Indiana corporation with its principal place of business in Indianapolis, Indiana. Elevance Health is registered to do business in the State of Indiana.

4.      Defendant Vinod Mohan was formerly employed at Elevance Health as its President, West Region Medicare.

5.      Defendant Mohan is an individual and citizen of California. Mohan is domiciled in California and resides at 17371 Greatpoint Circle, Huntington Beach, California 92649.

## SUBJECT MATTER JURISDICTION

6.      This Court has original subject matter jurisdiction over Counts III and VI of this Complaint because they arise under the laws of the United States, namely the Defend Trade Secrets Act, 18 U.S.C. § 1836, and the Computer Fraud and Abuse Act, 18 U.S.C. § 1030. Accordingly, this Court has original jurisdiction over those claims under 28 U.S.C. § 1331.

7.      This Court has supplemental jurisdiction over Counts I, II, IV, V, and VII because they are so related to Counts III and VI, claims within this Court's original jurisdiction, that they form part of the same case or controversy under Article III of the United States Constitution. 28 U.S.C. § 1367.

8.      Additionally, Plaintiff Elevance Health is a citizen of Indiana, and Defendant Mohan is a citizen of California. Thus, complete diversity is present.

9.     The amount in controversy exceeds $75,000 exclusive of interest and costs. As discussed in detail below, Elevance Health seeks to recover damages, injunctive relief, and attorneys' fees and costs against Mohan. Elevance Health's claim for damages exceeds $75,000. The injunctive relief sought also exceeds $75,000, because, absent the entry of injunctive relief, Mohan will be free to continue to misappropriate Elevance Health's trade secrets and other confidential information, resulting in damages to Elevance Health exceeding the jurisdictional minimum.

10.     Accordingly, the Court also has subject matter jurisdiction in this matter pursuant to 28 U.S.C. § 1332 because complete diversity exists and the amount in controversy exceeds $75,000.

**PERSONAL JURISDICTION AND VENUE**

11.     Personal jurisdiction and venue are proper in this District and Division because there is a substantial connection between the events and property giving rise to the cause of action and the District and Division. Elevance Health is headquartered in Indianapolis, Mohan reported to executives based in Indianapolis, and the trade secrets that Mohan misappropriated from Elevance Health have their situs in this District. As an Elevance Health employee, Mohan communicated regularly with Indiana-based employees and traveled to Indiana for meetings.

**FACTS COMMON TO ALL COUNTS**

**A.     Elevance Health Develops and Utilizes Market-Leading Healthcare Programs.**

12.     Elevance Health is one of the nation's leading healthcare benefit companies, serving approximately 40 million medical members through its affiliated health plans. Elevance Health is an independent licensee of the Blue Cross and Blue Shield Association ("**BCBS**") and serves its members as the Blue Cross licensee for California and as the Blue Cross and Blue Shield licensee for Colorado, Connecticut, Georgia, Indiana, Kentucky, Maine, Missouri, Nevada, New

3

Hampshire, New York, Ohio, Virginia, and Wisconsin. Elevance Health also conducts business in Louisiana, South Carolina, and western New York through its arrangements with other BCBS licensees and serves customers in over 25 states through its subsidiaries. Elevance Health has approximately 77,000 employees, with 5,477 employees located in Indiana.

13.    Elevance Health's medical membership includes seven different customer types: Local Group, Individual, National Accounts, BlueCard, Medicare, Medicaid and the Federal Employment Program. Elevance Health offers a broad spectrum of network-based managed care plans in the Large Group, Small Group, Individual, Medicaid and Medicare markets, as well as a broad array of managed care services to self-funded customers. Elevance Health also offers an array of specialty and other insurance products, such as dental, vision, and life insurance, and a Pharmacy Benefits Manager. Elevance Health's customers are located across the United States.

14.    As the Blue Cross Blue Shield licensee and through its subsidiaries, including Amerigroup, Elevance Health serves members enrolled in Medicaid programs in Arkansas, California, Colorado, Florida, Georgia, Indiana, Iowa, Kentucky, Louisiana, Maryland, Minnesota, Nevada, New Jersey, New York, North Carolina, South Carolina, Tennessee, Texas, Virginia, Washington, West Virginia, Wisconsin, and the District of Columbia.

15.    Among its plan offerings, Elevance Health offers Chronic Condition Special Needs Plans ("**C-SNPs**") to people eligible for Medicare and dealing with a chronic or disabling condition.  These plans include C-SNPSs for people with diabetes mellitus and cardiovascular disorders, among other chronic conditions. Elevance Health also offers several "dual-eligible" programs including Dual Special Needs Plans ("**D-SNPs**") and Medicare-Medicaid Plans ("**MMPs**") to people eligible for both Medicare and Medicaid benefits.

16.     Elevance Health operates in a highly competitive industry in which its success is the result of years of hard work and ingenuity. Elevance Health's confidential, proprietary, and trade secret information and administrative and operational acumen allow it to maintain market share and thrive in this extremely competitive industry. Elevance Health's business is profitable by virtue of its strategic structuring and implementation of its distribution, provider networks, portfolio of member benefit plans, and substantial investments in operational improvement, all of which is driven by information that is regarded as highly confidential by Elevance Health and its competitors. Elevance Health has developed and maintained its competitive position in the market in large part because of this confidential and proprietary information, which Elevance Health takes significant measures to safeguard from public dissemination.

17.     To maintain Elevance Health's competitive advantage and position in the marketplace, Elevance Health expends substantial time, effort, and expense developing trade secrets and other confidential business information, which include, but are not limited to: competitive intelligence about Medicare bidding opportunities; internal analyses of market position, threats, and opportunities; strategic plans for Medicare bidding; strategic sales and marketing plans; plan administration information and financial metrics and margins; provider and broker lists; and other business methods, strategies, and plans, including sales strategies and methods.

18.     To protect its trade secrets and other confidential and proprietary business information, Elevance Health stores its trade secrets and confidential information on secure computer systems. In addition, the information is compiled and stored in password-protected electronic databases, including proprietary internal programs through which Elevance Health aggregates and monitors information relating to its operations. Access to confidential information

is further restricted to specific user profiles so that users on the network have access only to specific folders rather than the entire universe of Elevance Health's trade secrets and confidential information.

19.     Elevance Health also protects its confidential information and trade secrets by limiting access to such information to a select few senior executives at the company in whom it invests faith and trust, and by requiring those senior executives to execute confidentiality agreements.

**B.     As President of Elevance Health's Medicare West Region, Mohan was Entrusted with Elevance Health's Trade Secrets and Highly Confidential Information.**

20.     On September 21, 2020, Mohan joined Elevance Health (then known as "**Anthem, Inc.**") as its President, Medicare West Region. In this role, Mohan was responsible for Elevance Health's Medicare business in the following states: Arizona, California, Colorado, New Mexico, Nevada, Texas, Washington, and Florida.[1]

21.     In those states, Mohan was responsible for Elevance Health's strategy, financial performance, and operational execution of its Medicare business.

22.     Given her position and seniority at Elevance Health, Mohan was part of a handful of senior executives with comprehensive access to a significant amount of its highly confidential and proprietary information, including all financial, strategic, and propriety data related to Elevance Health's Medicare business nationally.

23.     Mohan met every two weeks with her counterpart, Neil Steffens, President, Medicare East Region, who is based in Indianapolis, regarding the division of responsibilities for Elevance Health's national Medicare business. When Mohan resigned, Mohan and Steffens were

---

[1] Though Florida is not part of Elevance Health's "West Region," Mohan assumed responsibility for Florida's Medicare business in May 2023, giving her in depth access to the highly confidential and propriety information of this additional key state in the Medicare market.

the only Medicare Regional Presidents at Elevance Health. (Declaration of Neil Steffens, **Exhibit 1** at ¶¶ 2 - 4.)

24.     Elevance Health entrusted Mohan with many of its trade secrets, including its competitive intelligence about Medicare bidding opportunities, internal analyses of Elevance Health's market position, threats to that position, and opportunities for growth. Mohan was responsible for leading the West Region, including overseeing operating profit and loss, provider network contracts, regional quality programs, STAR program bonuses, and long-term strategies to influence all the aforementioned.  (Declaration of Rhonda Clark, **Exhibit 2** at ¶ 2.)

25.     Elevance Health also provided Mohan with its strategic plans for Medicare bidding, strategic sales and marketing plans, plan administration information and financial metrics, pricing, marketing, business strategies for 2024 and beyond, forecasting data, planned expansions, planned reductions, use of proprietary product support tools and proprietary data including compensation, and relationships with health care providers and brokers in the markets that she led. (*Id*. at ¶ 3.)

26.     Each year, Medicare Advantage ("**MA**") organizations, such as Elevance Health and Molina, engage in a competitive bidding process. On the first Monday in June, they submit their bids to the Centers for Medicare & Medicaid Services ("**CMS**") for each MA plan they intend to offer the following year. Once bids are submitted, from June through October, MA organizations communicate confidentially with brokers and confidentially plan their marketing campaigns and sales strategies for the Annual Election Period ("**AEP**"), which begins in mid-October and runs through December. The AEP is when MA organizations sell, compete, and assess their performance on the market. (*Id.* at ¶ 4.)

27.     The period between bid submission (June) and the AEP (October) is *critical* in terms of protecting the confidentiality of communications, strategies, and planned campaigns. If

the organization's confidences are breached and such information is disclosed to its competitors during this critical period, the organization would be significantly harmed and would lose competitive advantage on the market. (*Id.* at ¶ 5.)

28.     In their positions as regional Medicare Presidents for Elevance Health, Mohan and Steffens met with Elevance Health Chief Executive Officer, Gail Boudreaux, several times per year regarding Elevance Health's Medicare bid process and strategy. (Ex. 1 at ¶ 5.)

29.     Additionally, Elevance Health provided Mohan with proprietary and confidential information regarding Elevance Health's compliance matters and areas of risk throughout the United States, as well as the company's overall strategy for both Medicare and Medicaid. (Ex. 2 at ¶ 6.)

30.     Mohan regularly attended meetings regarding Elevance Health's sales trends, disenrollment trends, planned growth, bid processes, strategy and progress, and marketing plans. (*Id.* at ¶ 7.)

31.     Prior to such meetings, Mohan received highly confidential information by email including market prioritization for Elevance Health's tiers of states, long-term growth strategies, investments and estimated performance data, direct marketing strategies, creative strategies (e.g., social media campaigns and television scripts), distribution strategies, future pricing considerations, product naming ideas, assumptions about and comparisons to competitors, etc. (*Id.* at ¶ 8.)

32.     Mohan was in a position of trust at Elevance Health, even getting the opportunity in 2023 to present to its Board of Directors about the competitive dynamics, opportunities for growth and differentiation, innovation, and strategies for maintaining and gaining market share in Medicare in California. (Declaration of Elena McFann, **Exhibit 3** at ¶ 5.)

33.     Elevance Health provided Mohan with comprehensive access that enabled her to obtain, print, and retain the company's highly confidential information and trade secrets for use within the scope of her employment. (Ex. 2 at ¶ 9.)

34.     Mohan primarily worked from home, and she regularly printed work documents on her home printer. (*Id.* at ¶ 10.)

35.     Mohan printed hundreds of Elevance Health files during the course of her employment. (Declaration of Jeffrey Dale, **Exhibit 11** at ¶ 2(b).)

36.     Mohan was given "the keys to the kingdom" at Elevance Health that unlocked "a substantial level of detail" regarding Elevance Health's primary strategic plans, information "one does not forget." (Ex. 3 at ¶ 6.)

**C.     Mohan Agreed to Protect Elevance Health's Trade Secrets and Confidential Information.**

37.     At the outset of her employment, Mohan was notified of the highly proprietary and confidential nature of the information Elevance Health would provide to her.  The Employment Agreement she signed on September 24, 2020 contained the following confidentiality provision at Section 9(a):

> (i) Executive recognizes that the Company derives substantial economic value from information created and used in its business which is not generally known by the public, including, but not limited to, plans, designs, concepts, computer programs, formulae, and equations; product fulfillment and supplier information; customer and supplier lists, and confidential business practices of the Company, its affiliates and any of its customers, vendors, business partners or suppliers; profit margins and the prices and discounts the Company obtains or has obtained or at which it sells or has sold or plans to sell its products or services (except for public pricing lists); manufacturing, assembling, labor and sales plans and costs; business and marketing plans, ideas, or strategies; confidential financial performance and projections; employee compensation; employee staffing and recruiting plans and employee personal information; and other confidential concepts and ideas related to the Company's business (collectively, "Confidential Information").

A true and accurate copy of Mohan's Employment Agreement is attached as **Exhibit 4**.

38.     Furthermore, Mohan expressly acknowledged and agreed that, by virtue of her employment with Elevance Health, she would have access to, and would use in the course of her duties, certain Confidential Information and "that Confidential Information constitutes trade secrets and confidential and proprietary business information of the Company, all of which is the exclusive property of the Company." (*Id.*)

39.     Additionally, by signing her Employment Agreement, Mohan agreed not to:

(A) use Confidential Information for the benefit of any person or entity other than the Company or its affiliates; (B) remove, copy, duplicate or otherwise reproduce any document or tangible item embodying or pertaining to any of the Confidential Information, except as required to perform the Participant's duties for the Company or its affiliates; or (C) while employed and thereafter, publish, release, disclose or deliver or otherwise make available to any third party any Confidential Information by any communication, including oral, documentary, electronic or magnetic information transmittal device or media.

(*Id.* at § 9(a)(ii).)

40.     During her employment with Elevance Health as a highly compensated senior executive, Mohan received the opportunity to participate in Elevance Health's Incentive Compensation Plan (the "**Incentive Compensation Plan**") (attached as **Exhibit 5**) and received stock options, restricted stock grants, and performance stock unit grants.

41.     On or about October 1, 2020, Mohan received an award of 419 shares of nonqualified stock options to purchase shares of Elevance Health stock, an award of 157 performance stock units, as well as an award of restricted stock grants for 741 shares of Elevance Health stock, all subject to conditions enumerated in the notices accompanying those awards. True and accurate copies of Mohan's October 1, 2020 Notice of Option Grant, Notice of Performance Stock Unit Grant, and Notice of Restricted Stock Unit Grant are attached as **Exhibit 6** (collectively, the "**2020 Equity Agreements**").

42.    On or about March 1, 2021, Mohan received an award of 1,120 shares of nonqualified stock options to purchase shares of Elevance Health stock, an award of 546 performance stock units, and an award of restricted stock grants for 273 shares of Elevance Health stock all subject to conditions enumerated in the notices accompanying those awards. True and accurate copies of Mohan's March 1, 2021 Notice of Option Grant, Notice of Performance Stock Unit Grant, and Notice of Restricted Stock Unit Grant are attached as **Exhibit 7** (collectively, the "**2021 Equity Agreements**").

43.    On or about March 1, 2022, Mohan received an award of 882 shares of nonqualified stock options to purchase shares of Elevance Health stock, an award of 443 performance stock units, and an award of restricted stock grants for 222 shares of Elevance Health stock, all subject to conditions enumerated in the notices accompanying those awards. True and accurate copies of Mohan's March 1, 2022 Notice of Option Grant, Notice of Performance Stock Unit Grant, and Notice of Restricted Stock Unit Grant are attached as **Exhibit 8** (collectively, the "**2022 Equity Agreements**").

44.    On or about March 1, 2023, Mohan received an award of 819 shares of nonqualified stock options to purchase shares of Elevance Health stock, an award of 426 performance stock units, and an award of restricted stock grants for 214 shares of Elevance Health stock, all subject to conditions enumerated in the notices accompanying those awards. True and accurate copies of Mohan's March 1, 2023 Notice of Option Grant, and Notice of Performance Stock Unit Grant, and Notice of Restricted Stock Unit Grant are attached as **Exhibit 9** (collectively, the "**2023 Equity Agreements**").

45.     Like her Employment Agreement, Mohan's 2020, 2021, 2022, and 2023 Equity Agreements (referred to collectively as "**Equity Agreements**") contained restrictions on Mohan's use of Elevance Health's Confidential Information ("**Confidentiality Provisions**").

46.     In Section 7(a) of the Equity Agreements, Mohan recognized that Elevance Health derives substantial economic value from its "Confidential Information," which is defined to include:

> plans, designs, concepts, computer programs, formulae, and equations; product fulfillment and supplier information; customer and supplier lists, and confidential business practices of the Company, its affiliates and any of its customers, vendors, business partners or suppliers; profit margins and the prices and discounts the Company obtains or has obtained or at which it sells or has sold or plans to sell its products or services (except for public pricing lists); manufacturing, assembling, labor and sales plans and costs; business and marketing plans, ideas, or strategies; confidential financial performance and projections; employee compensation; employee staffing and recruiting plans and employee personal information; and other confidential concepts and ideas related to the Company's business.

(Exs. 6 – 9 at § 7(a).) "Confidential Information" is also defined to include information protected by the Indiana Uniform Trade Secrets Act or other applicable law, unless such information is known to Mohan or the general public through means other than a breach of a duty to maintain the confidentiality of such information.

46.     Mohan agreed that, for so long as Elevance Health's Confidential Information remained confidential, she would not:

> (A) use Confidential Information for the benefit of any person or entity other than the Company or its affiliates; (B) remove, copy, duplicate or otherwise reproduce any document or tangible item embodying or pertaining to any of the Confidential Information, except as required to perform the Participant's duties for the Company or its affiliates; or (C) while employed and thereafter, publish, release, disclose or deliver or otherwise make available to any third party any Confidential Information by any communication, including oral, documentary, electronic or magnetic information transmittal device or media.

(*Id.*)

47.    Mohan further agreed to return all of Elevance Health's Confidential Information and other property upon termination. (*Id.*)

48.    Additionally, Mohan agreed that if at any time she breached the Confidentiality Provisions she must forfeit all unexercised Elevance Health stock options and any outstanding restricted stock (the "**Equity**"), and that she is required to return to Elevance Health the excess of the fair market value over the exercise price for all stock acquired on exercise of an option within the last twenty-four (24) months, and the fair market value of any common stock that became vested within the last twenty-four (24) months (the "**Stock Excess Value**"). Specifically, the Equity Agreements provide that:

> (iii) [the Participant] shall pay to the Company (A) for each share of common stock of the Company ("Common Share") acquired on exercise of an option under a Designated Plan within the 24 months prior to such breach, the excess of the fair market value of a Common Share on the date of exercise over the exercise price, and (B) for each share of restricted stock and/or performance stock that became vested under any Designated Plan within the 24 months prior to such breach, the fair market value (on the date of vesting) of a Common Share.

(Exs. 6 – 9 at § 8(a).) Mohan agreed that these amounts would not reduce any money damages caused by a breach. (*Id.*)

49.    In Section 9(a) of the Equity Agreements, Mohan acknowledged that the Confidentiality Provisions "are reasonable and necessary to preserve the legitimate business interests of the Company, its present and potential business activities and the economic benefits derived therefrom; that they will not prevent her from earning a livelihood in the Participant's chosen business and are not an undue restraint on the trade of the Participant, or any of the public interests which may be involved." (Exs. 6 – 9 at § 9(a).)

50.    Furthermore, Mohan agreed that if she "commits or threatens to commit a breach" of the Confidentiality Provisions, then Elevance Health "shall have the right to seek and obtain all

appropriate injunctive relief and other equitable remedies," and agreed that "any such breach would cause irreparable injury to the Company and that money damages would not provide an adequate remedy." (Exs. 6 – 9 at § 9(b).)

51.     Mohan agreed that, in the event of a breach, the prevailing party "shall be entitled to the recovery of its reasonable attorneys' fees and expenses (including not only costs of court, but also expert fees, travel expenses, and other expenses incurred), and any other legal or equitable relief allowed by law." (Ex. 9 at § 9(e); *see also* Ex. 8 at § 9(i).)

**D.     Mohan Resigned from Elevance Health to Work for its Direct Competitor Molina Healthcare, Inc. and Misappropriated Elevance Health's Confidential Information.**

52.     Molina is a national managed care organization that directly competes with Elevance Health in the Medicaid, Medicare, and Individual Affordable Care Act lines of business. Molina offers dual-eligible programs, including MMPs and Molina Medicare Options Plus (HMO SNP) Plans, that combine Medicaid and Medicare benefits for beneficiaries who are eligible for both Medicare and Medicaid.

53.     As shown on the map embedded below[2], through its health plans, Molina serves medical members in the states of Arizona, California, Florida, Idaho, Illinois, Indiana, Iowa, Kentucky, Massachusetts, Michigan, Mississippi, Nebraska, Nevada, New Mexico, New York, Ohio, South Carolina, Texas, Utah, Virginia, Washington, and Wisconsin.

---

[2] *Molina Healthcare of Georgia*, MOLINA HEALTHCARE, https://www.molinahealthcare.com/members/common/georgia (last visited Aug. 22, 2023).



54.     As the map above illustrates, Molina actively and directly competes against Elevance Health for Medicare market share in the following states where Mohan was responsible for Elevance Health's Medicare business: Arizona, California, New Mexico, Nevada, Texas, Washington, and Florida.

55.     Additionally, within the last four years, Molina has hired the following senior executives away from Elevance Health:

a.  In 2019, Marc Russo, President of Medicare, became Molina's Executive Vice President of Medicaid Health Plans.

b.  In 2020, Kerry Sheridan, Regional Vice President of Clinical Quality Management, became Molina's Senior Vice President for Risk and Quality Solutions.

c.  In 2020, Christy Conley, Director II Performance Enhancement, became Molina's Director of Business Operations.

d. In 2020, Suzette Valentine, Vice President of Government Business Division Operations and Systems Solutions, became Molina's Senior Vice President Integration and Implementation.

e. In 2021, Chutney Arrington, Director II, Quality Management in the Government Business Division, became Molina's Associate Vice President of Quality Improvement.

f. In 2021, Tiffany Maurer, Director of Risk Adjustment Programs, became Molina's Associate Vice President.

g. In 2021, Rodrick McGrew, Staff Vice President for Sales Support and Strategy, became Molina's Vice President for New Market Growth & Integration.

56.     Upon information and belief, Mohan met with several Molina representatives during Spring and Summer of 2023 while employed by Elevance Health.

57.     Mohan met confidentially via Zoom with Molina's Senior Executive Vice President and Chief Operating Officer James Woys on July 3, 2023. (*See* Automatic Reply re July 3, 2023 Woys Zoom Meeting, **Exhibit 10**.)

58.     On July 6, 2023, a mere three (3) days after her Zoom meeting with Molina's COO, Mohan attended a highly confidential Marketing Strategy Meeting regarding the 2024 AEP. Topics included Elevance Health's 2024 AEP market strategy, creative strategy, and media strategy. After the meeting, Mohan received documents containing campaign concepts, creative samples, tier structure, and media mix – highly critical and confidential information. (Ex. 2 at ¶ 11.)

59.     On July 17, 2023 at 9:54 a.m. ET, Mohan texted her supervisor, Elena McFann, President of Elevance Health's Government Business Division, "let me know when you have a few minutes" and McFann responded "now." At 9:55 a.m. ET, McFann and Mohan had a three-minute phone call wherein Mohan advised that she was leaving and had accepted a position with

Molina.  Mohan represented to McFann that she had not logged into her computer yet that day. McFann advised her to log in and create an out-of-office message directing all inquiries to her assistant, Stella Lee, to send her a formal resignation, and then to "step away from the keyboard." (Ex. 3 at ¶ 7.)

60.     McFann then immediately contacted Elevance Health's technology department and requested that they disable Mohan's account. (*Id.* at ¶ 8.)

61.     Instead of complying with McFann's instructions, at 10:01 a.m. ET, Mohan attempted to print a highly confidential PowerPoint presentation entitled "CY2024 Medicare Pass 2 West Region Bid Strategy_041023.pptx" on her home printer. (Ex. 11 at ¶ 2(a).) The printer Mohan used remains in her possession. Therefore, Elevance Health is unable to determine whether her attempt to print the presentation was successful.

62.     As the date in the title shows, the CY2024 Medicare Pass 2 West Region Bid Strategy_041023 was transmitted to recipients in April 2023, which is when it was sent to Mohan, and when it was presented to Elevance Health's CEO, Gail Boudreaux. (Ex. 2, at ¶ 12.)

63.      The presentation is designated "Company Confidential – Internal Use Only – Do Not Copy." (*Id.*)

64.     As the title and the confidential designation suggest, the slide deck Mohan attempted to print at her home on July 17, 2023 at 10:01 a.m. ET, minutes after resigning her position and being directed to "step away" from her keyboard, contains Elevance Health's highly confidential proprietary information, data, and trade secrets related to its Medicare bid strategy for the West Region. For instance, slide 3 lists Elevance Health's 2023 West Region bid priorities; slides 4 and 5 are spreadsheets of West Region investment data for 2023 and 2024; slide 6 is a table containing 2024 planned service area expansions; slide 8 is a spreadsheet of membership

projections and key financial metrics by state; slide 9 contains detailed financials for specific business units; and slide 12 contains key revenue metrics and projections for 2024; slides 20 through 26 contain membership and financial data, market position, and recommendations for 2024 for each West Region state. (*Id.* at ¶ 13.)

65.     A subsequent iteration of the presentation entitled "CY2024 Medicare Pass 3 West Region Bid Strategy_050323" was transmitted to recipients in May 2023. It contained less information about each of the West Region's states and about bid priorities than the April/Pass 2 iteration Mohan attempted to print. (*Id.* at ¶ 14.)

66.     On July 17, 2023 at 10:08 a.m. ET, after at least attempting to take Elevance Health's highly confidential Medicare strategy for herself, Mohan emailed Elevance Health notice of her resignation. A true and accurate copy of Mohan's Resignation Notice is attached as **Exhibit 12**.

67.     Elevance Health disabled Mohan's login and network access at 12:05 p.m. ET on July 17, 2023. (Ex. 11 at ¶ 4.)

68.     In her resignation notice addressed to McFann, Mohan again disclosed that she "accepted another role with Molina Healthcare," though she tellingly omitted that she would be taking a virtually identical executive position at Molina responsible for Medicare strategy— precisely the strategy that she had just taken from Elevance Health. She further expressed her gratitude to McFann "for [her] support and trust in me during my time here." (Ex. 12.)

69.     When Mohan attempted to print the CY2024 Medicare Pass 2 West Region Bid Strategy_041023 presentation mere minutes after resigning and being instructed to step away from her keyboard, she was not serving any legitimate business interest of Elevance Health. The only use Mohan would have for a confidential Elevance Health document after resigning from Elevance

Health would be for her own use and benefit and for that of her new employer, Elevance Health's direct competitor, Molina.

70.     On July 17, 2023, the same day Mohan emailed her resignation notice to Elevance Health, Eric Alderete, Senior Vice President & Deputy General Counsel of Molina Healthcare, Inc., sent a letter to Elevance Health's Executive Vice President, Chief Legal and Administrative Officer, Blair Todt, informing Elevance Health that Mohan "accepted a position as Senior Vice President of Medicare at Molina Healthcare" and that she "will *officially* start her position on August 30, 2023." (emphasis added).  A true and accurate copy of the July 17, 2023 Molina Letter is attached as **Exhibit 13**.

71.     Mohan failed to notify Elevance Health that she was speaking with Molina until after she had already accepted her new position as Molina's Senior Vice President of Medicare. Instead, for weeks if not months, Mohan obtained Elevance Health's Confidential Information and continued to attend highly sensitive strategic meetings with other Elevance Health senior executives.

72.     On August 4, 2023, Alderete mailed a second letter to Todt, in which he admitted on Mohan's behalf that "she _ [*sic*] one box of documents related to her employment at Elevance" and that the documents "are currently at her house." Alderete further admitted that Mohan spoke with Molina about the documents and that he asked her to sequester them. He then offered for Molina to "have the documents shredded" or for Mohan to "send them back to Elevance." A true and accurate copy of the August 4, 2023 Molina Letter is attached as **Exhibit 14**.

73.     At Elevance Health's direction, Alderete coordinated the shipment of a box containing several highly confidential documents related to Elevance Health's Medicare business to Elevance Health's headquarters in Indianapolis. The box arrived at Elevance Health's

headquarters on Thursday, August 17, 2023. Importantly, the box did *not* include the CY2024 Medicare Pass 2 West Region Bid Strategy_041023 presentation Mohan attempted to print minutes after resigning and being instructed to step away from her keyboard. (Declaration of Lyndsey Johnson, **Exhibit 15** at ¶¶ 2 - 5).)

74.     The box contained several documents, but not the hundreds printed by Mohan over the course of her employment with Elevance Health. (Ex. 11 at ¶ 2(b); Ex. 15 at ¶ 4.)

75.     Thus, even though Mohan eventually returned several documents she wrongfully retained for nearly four weeks prior to Molina coordinating their return to Elevance Health, it appears that Mohan continues to retain additional documents containing Confidential Information and trade secrets she misappropriated from Elevance Health.

76.     Elevance Health is unable to determine from the box of documents received what additional Confidential Information and trade secrets Mohan has printed, retained, reproduced, and/or disclosed, or what she continues to retain, reproduce, and/or disclose to Molina and other third parties.

77.     Mohan's misappropriation of Elevance Health's highly confidential documents, and failure to return Elevance Health's confidential information, will benefit her new employer and Elevance Health's direct competitor, Molina, to Elevance Health's great detriment.

78.     The Confidential Information and trade secrets in the documents Mohan retained are only a fraction of the information Mohan created and learned at Elevance Health. Mohan will undoubtedly remember the Confidential Information and trade secrets for the foreseeable future and will inevitably use them in her role at Molina.

79.     The timing of Mohan's misappropriation and her actual and inevitable disclosure to Molina is especially damaging to Elevance Health. She has breached and is breaching her duties

to Elevance Health during the most critical period, when these direct competitors solidify their confidential marketing plans, campaigns, and sales strategies, and engage in confidential communications with brokers for the AEP, which opens October 15th.

80.     As such, Elevance Health has suffered and will continue to suffer incalculable harm without the Court's immediate intervention.

### COUNT I – BREACH OF CONTRACT

**Mohan Breached the Confidentiality Provisions of the Equity Agreements by Misappropriating Elevance Health's Confidential Information.**

81.     Elevance Health incorporates by reference all allegations in the preceding paragraphs as though fully restated here.

82.     Mohan entered into valid and enforceable contracts, the Equity Agreements, for valuable consideration.

83.     The Equity Agreements remain in full force and effect. Mohan has a continuing obligation to abide by the terms of those Equity Agreements, including the Confidentiality Provisions, which are reasonably necessary to protect Elevance Health's trade secrets and other Confidential Information.

84.     Pursuant to the Confidentiality Provisions of the Equity Agreements, Mohan agreed not to use Elevance Health's Confidential Information for the benefit of any person or entity other than Elevance Health; she agreed not to remove or reproduce any such information, except as required to perform her duties as an Elevance Health employee; she agreed not to disclose such information to any third party; and she agreed to return all such information and property to Elevance Health upon termination.

85.     Elevance Health has satisfied all of its obligations under the terms and conditions of the Equity Agreements. All conditions precedent to this action have been performed, excused, or waived.

86.     Mohan has breached and will continue to breach the Equity Agreements by printing and retaining Elevance Health's Confidential Information at her home office, by failing to return Elevance Health's Confidential Information upon termination; by using, duplicating, and/or disclosing Elevance Health's Confidential Information to third parties, such as Molina; and by otherwise misappropriating Elevance Health's Confidential Information as detailed in this Complaint.

87.     As a direct and proximate cause of Mohan's breaches and threatened breaches, Elevance Health has suffered damages and will suffer damages in an amount to be determined at trial.

88.     Mohan agreed that if she were to breach or threaten to breach the Confidentiality Provisions of the Equity Agreements, "any such breach would cause irreparable injury" to Elevance Health and that Elevance Health "shall have the right to seek and obtain all appropriate injunctive and other equitable remedies."

89.     By virtue of the foregoing, Elevance Health has demonstrated a likelihood of success and that a balancing of the equities favors the issuance of an injunction against Mohan.

90.     The public interest would not be disserved by the granting of an injunction.

91.     Elevance Health stands without an adequate remedy at law, and, unless restrained by the Court, Mohan's breach of the Equity Agreements will cause Elevance Health irreparable damage and injury.

92.     The threatened harm to Elevance Health if the Court does not grant such restraint outweighs the risk of harm to Mohan from such a restraint.

## COUNT II – VIOLATION OF THE INDIANA UNIFORM TRADE SECRETS ACT, Ind. Code §24-2-3-1 *et seq*.

**Mohan Violated the Indiana Uniform Trade Secrets Act by Misappropriating and Threatening to Misappropriate Elevance Health's Trade Secrets.**

93.     Elevance Health incorporates by reference all allegations in the preceding paragraphs as though fully restated here.

94.     Elevance Health's trade secrets and confidential/proprietary information derive actual and potential independent economic value from not being generally known to, and not being readily ascertainable through proper means by, other persons who can obtain value from their disclosure and use, and because the information is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

95.     Elevance Health has taken, and continues to take, reasonable efforts to maintain the confidentiality and secrecy of such information.

96.     Elevance Health's trade secrets and confidential/proprietary information constitute trade secrets pursuant to Indiana Uniform Trade Secrets Act, Ind. Code §24-2-3-1 *et seq*.

97.     By virtue of her employment with, and performance of responsibilities for, Elevance Health, Elevance Health entrusted Mohan with its trade secrets.

98.     Elevance Health's trade secrets contain detailed and specific information about Elevance Health's competitive intelligence regarding Medicare bidding opportunities; internal analyses of market position, threats, and opportunities; strategic plans for Medicare bidding; strategic sales and marketing plans; plan administration information and financial metrics and margins; and other business methods, strategies, and plans. One does not simply forget such trade secrets. They are precisely the types of information that a competitor like Molina could use to undercut Elevance Health and gain a competitive advantage over Elevance Health in the market.

99. Mohan acted in bad faith by meeting surreptitiously with Molina executives while employed by Elevance Health and while harvesting Elevance Health's trade secrets and Confidential Information.

100. Mohan acted in bad faith by misappropriating and failing to return Elevance Health's Confidential Information and trade secrets upon termination of her employment.

101. Mohan knew or had reason to know that such information was trade secret information.

102. Mohan's conduct demonstrates her intent to use and disclose Elevance Health's trade secrets to benefit Molina and to harm Elevance Health.

103. Given the nature and extent of the trade secrets Elevance Health entrusted to Mohan during her employment, if she goes to work for Molina's Medicare business, especially in Arizona, California, Colorado, New Mexico, Nevada, Texas, Washington, or Florida, she will inevitably use and disclose those trade secrets in the course of providing services to Molina. Thus, Mohan threatens to intentionally, wrongfully, willfully, and maliciously misappropriate Elevance Health's trade secrets and other confidential/proprietary information, and Mohan should be enjoined from such misappropriation.

104. By virtue of the foregoing, Elevance Health has demonstrated a likelihood of success and that a balancing of the equities favors the issuance of an injunction against Mohan.

105. Mohan's actual and threatened misappropriation has caused and will continue to cause irreparable harm to Elevance Health for which it has no adequate remedy at law. Elevance Health cannot presently ascertain the exact extent, nature, and amount of such potential injury, which may not stand subject to precise calculation.

106.    As such, monetary damages alone cannot fully compensate Elevance Health for Mohan's conduct.

107.    Elevance Health stands without an adequate remedy at law, and, unless restrained by the Court, Mohan's misappropriation and threatened misappropriation will cause Elevance Health irreparable damage and injury.

108.    The threatened harm to Elevance Health if the Court does not grant such restraint outweighs the risk of harm to Mohan from such a restraint.

109.    The public interest would not be disserved by the granting of an injunction.

**COUNT III – VIOLATION OF THE DEFEND TRADE SECRETS ACT OF 2016, 18 U.S.C. § 1832 *et seq*.**

**Mohan Violated the Defend Trade Secrets Act of 2016 by Misappropriating and Threatening to Misappropriate Elevance Health's Trade Secrets.**

110.    Elevance Health incorporates by reference all allegations in the preceding paragraphs as though fully restated here.

111.    Elevance Health's trade secrets and confidential/proprietary information derive actual and potential independent economic value from not being generally known to, and not being readily ascertainable through proper means by, other persons who can obtain value from their disclosure and use, and because the information is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

112.    As such, Elevance Health's trade secrets and confidential/proprietary information constitute trade secrets pursuant to the Defend Trade Secrets Act.

113.    Elevance Health has taken, and continues to take, reasonable efforts to maintain the confidentiality and secrecy of such information.

114. By virtue of her employment with, and performance of responsibilities for, Elevance Health, Elevance Health entrusted Mohan with its trade secrets.

115. Elevance Health's trade secrets contain detailed and specific information about Elevance Health's competitive intelligence regarding Medicare bidding opportunities; internal analyses of market position, threats, and opportunities; strategic plans for Medicare bidding; strategic sales and marketing plans; plan administration information and financial metrics and margins; and other business methods, strategies, and plans. One does not simply forget such trade secrets. They are precisely the types of information that a competitor like Molina could use to undercut Elevance Health and gain a competitive advantage over Elevance Health in the market.

116. Mohan acted in bad faith by meeting surreptitiously with Molina executives while employed by Elevance Health and while harvesting Elevance Health's trade secrets and Confidential Information.

117. Mohan acted in bad faith by misappropriating and failing to return Elevance Health's Confidential Information and trade secrets upon termination of her employment.

118. Mohan knew or had reason to know that such information was trade secret information.

119. Mohan's conduct demonstrates her intent to use and disclose Elevance Health's trade secrets to benefit Molina and to harm Elevance Health.

120. Given the nature and extent of the trade secrets Elevance Health entrusted to Mohan during her employment, if she goes to work for Molina's Medicare business, especially in Arizona, California, Colorado, New Mexico, Nevada, Texas, Washington, or Florida, she will inevitably use and disclose those trade secrets in the course of providing services to Molina. Thus, Mohan threatens to intentionally, wrongfully, willfully, and maliciously misappropriate Elevance Health's

trade secrets and other confidential/proprietary information, and Mohan should be enjoined from such misappropriation.

121.    By virtue of the foregoing, Elevance Health has demonstrated a likelihood of success and that a balancing of the equities favors the issuance of an injunction against Mohan.

122.    Mohan's actual and threatened misappropriation has caused and will continue to cause irreparable harm to Elevance Health for which it has no adequate remedy at law.  Elevance Health cannot presently ascertain the exact extent, nature, and amount of such potential injury, which may not stand subject to precise calculation.

123.    As such, monetary damages alone cannot fully compensate Elevance Health for Mohan's conduct.

124.    Elevance Health stands without an adequate remedy at law, and, unless restrained by the Court, Mohan's misappropriation and threatened misappropriation will cause Elevance Health irreparable damage and injury.

125.    The threatened harm to Elevance Health if the Court does not grant such restraint outweighs the risk of harm to Mohan from such a restraint.

126.    The public interest would not be disserved by the granting of an injunction.

### COUNT IV – BREACH OF FIDUCIARY DUTY

**Mohan Breached her Fiduciary Duty of Loyalty to Elevance Health.**

127.    Elevance Health incorporates by reference all allegations in the preceding paragraphs as though fully restated here.

128.    As an employee of Elevance Health, Mohan owed Elevance Health a fiduciary duty of loyalty.

129.    Mohan breached her fiduciary duty of loyalty to Elevance Health by undertaking activity for the benefit of herself and Molina while still employed with Elevance Health.

130.    As a direct and proximate result of Mohan's breach of said fiduciary duty of loyalty, Elevance Health has been damaged and continues to sustain damages.

**COUNT V – CONVERSION**

**Mohan Converted Elevance Health Property.**

131.    Elevance Health incorporates by reference all allegations in the preceding paragraphs as though fully restated here.

132.    Mohan knowingly and intentionally exerted unauthorized control over Elevance Health's property by printing and retaining confidential and proprietary information while employed by Elevance Health (and just after resigning from Elevance Health) with no legitimate business purpose and by continuing to possess this information after her employment with Elevance Health terminated.

133.    As a direct and proximate result of Mohan's conversion of Elevance Health's property, Elevance Health has been damaged and continues to sustain damages.

134.    Mohan's conversion of Elevance Health property falls within Indiana's Victim's Recovery Act, Ind. Code § 34-24-3-1, entitling Elevance Health to treble damages and attorney's fees.

**COUNT VI – VIOLATION OF THE COMPUTER FRAUD AND ABUSE ACT,
18 U.S.C. § 1030**

**Mohan Knowingly, and with Intent to Defraud, Accessed Elevance Health's
Protected Computer without Authorization.**

135.    Elevance Health incorporates by reference all allegations in the preceding paragraphs as though fully restated here.

136.    Elevance Health's network and related company-owned electronic devices, accounts, and databases are "protected computers" under the Computer Fraud and Abuse Act.

137.    By attempting to print Elevance Health's Confidential Information after resigning and being specifically instructed by her supervisor to "step away from the keyboard," Mohan knowingly and intentionally accessed Elevance Health's network and company-owned computer without authorization and/or in excess of her authorized access, with intent to defraud Elevance Health and with an intent to misappropriate its confidential, proprietary, and trade secret information for use in competition against Elevance Health following resignation of her employment.

138.    As a direct and proximate result of Mohan's unauthorized access to its internal network and company-owned computer, and subsequent misappropriation of its confidential, proprietary, and trade secret information, Elevance Health has suffered and will continue to suffer losses in excess of $5,000 during the applicable one-year period.

### COUNT VII – VIOLATION OF INDIANA'S COMPUTER TRESPASS STATUTE, Ind. Code § 34-43-2-3

**Mohan Knowingly and Intentionally Accessed Elevance Health's Computer System without Consent.**

139.    Elevance Health incorporates by reference all allegations in the preceding paragraphs as though fully restated here.

140.    Elevance Health's internal network and company-owned computers constitute "computer systems" and "computer networks" under the Indiana Computer Trespass law.

141.    By attempting to print Elevance Health's Confidential Information after resigning and being specifically instructed to "step away from the keyboard," Mohan knowingly and

intentionally accessed Elevance Health's internal network and company-owned computer without Elevance Health's consent.

142.   Elevance Health has been damaged by Mohan's violation of the Indiana Computer Trespass law and subsequent misappropriation of its confidential and trade secret information.

143.   Mohan's violation of the Indiana Computer Trespass law falls within Indiana's Victim's Recovery Act, Ind. Code § 34-24-3-1, entitling Elevance Health to treble damages and attorney's fees.

### REQUESTED RELIEF

WHEREFORE, Elevance Health, Inc. prays for judgment against Defendant Vinod Mohan and respectfully requests the following relief against Mohan:

a.   That the Court set a hearing on Elevance Health's application for preliminary injunction and issue a preliminary and permanent injunction:

1. Enjoining Mohan from further breaching the Confidentiality Provisions of the Equity Agreements;

2. Enjoining Mohan from taking any further action to misappropriate and disclose Elevance Health's trade secrets and other Confidential Information;

3. Enjoining Mohan from modifying, deleting, or in any way tampering with any information or documents that belong to Elevance Health;

4. Enjoining Mohan from participating in Molina's Medicare business in the following states for as long as the trade secrets she misappropriated retain their trade secret status: Arizona, California, Colorado, New Mexico, Nevada, Texas, Washington, and Florida;

5. Directing Mohan to cause the identification and return of all Elevance Health trade secrets and other Confidential Information she has taken from Elevance Health; and

6. Mohan to return to Elevance Health the excess of the fair market value over the exercise price for all stock acquired on exercise of an option within the last twenty-four (24) months, and the fair market value of any common stock that became vested within the last twenty-four (24) months (the "**Stock Excess Value**").

b. That Elevance Health be awarded compensatory and treble damages in an amount to be determined at trial;

c. That Elevance Health be awarded punitive damages;

d. That Elevance Health be awarded its costs, expenses, and attorneys' fees incurred in bringing this action as provided for in the Equity Agreements; and

e. That the Court grant such further relief as it deems just and proper.

FROST BROWN TODD LLP

By: */s/ Kandi Kilkelly Hidde*
　　Kandi Kilkelly Hidde, #18033-49
　　Darren A. Craig, #25534-49
　　Patricia Román Hass, #29461-45
　　111 Monument Circle, Suite 4500
　　P.O. Box 44961
　　Indianapolis, IN 46244-0961
　　Telephone:　(317) 237-3800
　　Facsimile:　(317) 237-3900
　　Email:　　　khidde@fbtlaw.com
　　　　　　　dcraig@fbtlaw.com
　　　　　　　promanhass@fbtlaw.com

Attorneys for Plaintiff Elevance Health, Inc.